Filed 8/15/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SHAMEKA WINSLETT,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>1811 27TH AVENUE, LLC, et al.,<br><br>        Defendants and Respondents. | A146932<br><br>(Alameda County<br>Super. Ct. No. RG15762846) |

Shameka Winslett filed a complaint asserting various claims against her former landlord Yugal Sagi and his LLC after he failed to make repairs to her apartment and filed an unlawful detainer action against her.  Sagi responded by filing an anti-SLAPP motion to strike three of these claims, for retaliation and retaliatory eviction under Civil Code section 1942.5,[1] former subdivision (c)[2] and for violation of Oakland Municipal Code section 8.22.300 et seq., known as the Oakland Just Cause For Eviction Ordinance (the Just Cause Ordinance).  The trial court granted the motion, with an award of attorney fees and costs to Sagi.  Winslett now appeals, claiming the court erred by ruling that (1) the litigation

---

[1] All statutory references are to the Civil Code unless otherwise stated.

[2] By recent amendment effective January 1, 2018, section 1942.5, former subdivision (c) has been redesignated subdivision (d) in a set of revisions designed, among other things, to accommodate the addition of several new subdivisions.  (See Stats. 2017, ch. 489, § 6, No. 6 West's Cal. Legis. Service, pp. 3720-3721.)  All further references to section 1942.5 and its subdivisions will be to the current, recently redesignated subdivisions, except in certain instances where, in our discussion of prior law, we specifically reference former subdivisions for purposes of clarity.

privilege bars her retaliation and retaliatory eviction claims under section 1942.5, and (2) her claim for violation of the Just Cause Ordinance was based on protected activity under the anti-SLAPP statute. We agree on both counts and shall therefore reverse.

## I.

## BACKGROUND

Sometime in 2010, plaintiff Shameka Winslett and her two young children moved into an apartment in a building owned by 1811 27th Avenue LLC and Yugal Sagi (collectively Sagi).[3] Winslett lived with her children in this apartment for several years and had a third child during that time. By her account, the building was in a state of gross uninhabitability throughout her tenancy. There were alcohol bottles, condoms, drugs, and trash in the hallways, and inside her apartment, there was a lack of weatherproofing, water leaking from the upstairs unit, unsanitary kitchen and counters, and severe mold and mildew contamination.

Beginning in 2013, the pestilent conditions in Winslett's apartment became unbearable. She was pregnant at the time and wanted a healthy living environment for the day-to-day activity of her children, who at their tender ages were particularly vulnerable to filth and vermin. One of the most serious issues was the prevalence of cockroaches, which came from the refrigerator and stove in the apartment and from other units in the apartment complex. Despite her best efforts to clean, the cockroaches kept coming.

Around this same time, the mold and mildew grew so severe that it covered the refrigerator, walls, and window sills. The presence of loiterers and general lack of security added to the intolerable conditions. Winslett complained repeatedly to Sagi and his on-site property manager Edgar Vargas. In response to her numerous complaints, made both orally and in writing, Sagi and Vargas did very little. Winslett was told that the cockroaches were her own fault for not cleaning her apartment well enough and that if she paid her rent, which

---

[3] Yugal Sagi used the entity 1811 27th Avenue LLC as a vehicle to hold ownership of the building. We refer to Mr. Sagi and 1811 27th Avenue LLC collectively as "Sagi" for convenience.

2

had fallen into delinquency, the repairs she requested would be made. But after she paid her rent bill, no repairs were made. Winslett believed Sagi and Vargas were ignoring her complaints as a way to force her to move out. If she was so unhappy, she was told, she should just leave.

Because of Sagi's and Vargas's inaction, Winslett called Alameda County Health Care Services, Vector Control Services District (Vector Control), which, in August 2013, sent an inspector to her apartment to document the habitability issues she identified. After the inspection, the inspector spoke with Sagi and informed him the apartment needed to be repaired. Sagi was furious at Winslett and told her she should not have contacted Vector Control and not to call them again in the future. The inspector's visit led Sagi to make a few cosmetic repairs, such as painting over some water damage and mold, but within a few months the rot reappeared.

According to Winslett, even after she called Vector Control, her continued complaints to Sagi and Vargas were still ignored. At no point was she informed she had rights under the Oakland Municipal Code or that she could contact the Oakland Rent Board. Finally, in December 2014, Winslett felt she could not tolerate the situation anymore. She told Sagi the mold was causing her children to be sick and that the cockroaches were unbearable. She also told him she would not be paying her rent for January 2015 if these conditions were not resolved.

By January, no repairs having been made, Winslett withheld her rental payment. In response, Sagi served Winslett with a three-day notice to pay rent or quit and then an unlawful detainer action when she failed to pay, which she believed was in retaliation for her requests for repairs and her exercise of her right to withhold rent. Before the commencement of the unlawful detainer trial, the matter settled. Winslett and Sagi agreed that Winslett could remain in the apartment rent free for three months while looking for a new place to live; that she would then move out at Sagi's expense ($1,250 in moving

3

expenses); and that in return for her departure, Sagi would drop the unlawful detainer action.[4]

Not long after this settlement, Winslett sued Sagi for damages, ultimately alleging 15 causes of action in the operative first amended complaint.[5]  In response, Sagi filed a special motion to strike pursuant to Code of Civil Procedure section 425.16, commonly known as the anti-SLAPP statute.  By this motion, he sought to strike three of Winslett's claims—the eighth (retaliation in violation of § 1942.5), the tenth (violation of the Just Cause Ordinance), and the fifteenth (retaliatory eviction).  Sagi argued that these causes of action are based on the protected acts of serving a three-day notice and filing an unlawful detainer action.  The motion centered on an argument that the litigation privilege (§ 47, subd. (b)) bars liability for such acts.

In opposition to Sagi's anti-SLAPP motion, Winslett argued that none of her claims arises out of protected activity and that her claim for violation of the Just Cause Ordinance is not based on Sagi's litigation activity.  Winslett also argued that the litigation privilege does not bar claims for retaliation in violation of section 1942.5.  She supported her opposition with an evidentiary showing reciting and documenting the facts summarized

---

[4] The stipulated dismissal included a waiver of Sagi's claims for rent and daily damages through June 4, 2015 (the date Winslett moved out), a waiver of claims on both sides for fees and costs incurred in the unlawful detainer action, and a waiver of Winslett's claim to her security deposit and last month's rent.  The settlement terms do not mention any other claims and include no general mutual release of claims.

[5] The pleaded claims in the operative first amended complaint are for:  (1) tortious breach of the implied warranty of habitability (§ 1941); (2) contractual breach of the implied warranty of habitability (§ 1941); (3) violation of section 1942.4; (4) breach of contract (§ 3300 et seq.); (5) breach of quiet enjoyment (§ 1927); (6) private nuisance (§ 3501 et seq.); (7) premises liability (§ 1714); (8) retaliation in violation of section 1942.5, subdivision (d); (9) negligence; (10) violation of the Oakland Just Cause Ordinance (Oakland Mun. Code, § 8.22.300 et seq.); (11) violation of the Oakland Tenant Protection Ordinance (Oakland Mun. Code, § 8.22.600 et seq.); (12) constructive eviction—negligence; (13) unfair business practices (Bus. & Prof. Code, §§ 17200 et seq., 17500); (14) fraud; and (15) retaliatory eviction.

4

above, in her own declaration and various exhibits documenting her tenancy. Sagi lodged a raft of objections on relevance, hearsay, and lack of foundation grounds.

After hearing argument on the anti-SLAPP motion, the trial court granted it, striking all three of the challenged causes of action. The court ruled that these claims are based on protected activity because "the filing of unlawful detainer actions [is] protected activity," and "the gravamen of this case is . . . the UD case itself." The court also ruled, as a matter of law, that the litigation privilege prevents Winslett from succeeding on any of the three claims. It overruled Sagi's evidentiary objections, except for the relevance objection, which it sustained in light of its ruling on the litigation privilege.

Prominent in the court's reasoning was the voluntary settlement of the unlawful detainer action. The court noted that the unlawful detainer case was dismissed 12 days before Winslett filed her lawsuit against Sagi and indicated that it was bearing in mind the way that action ended—in the form of an agreed resolution. "[I]n looking at the probability of success in this case," the court said, the settlement was significant, since it bore on "the potential relevancy" to the merits of her current claims.

This timely appeal followed. Three days after Winslett filed her notice of appeal, Sagi filed a motion in the trial court for attorney fees and costs under Code of Civil Procedure section 425.16, subdivision (c)(1). That motion was eventually granted, with the court awarding him $9,465 in fees and costs. Along with her appeal of the order on the underlying anti-SLAPP motion, Winslett now seeks review of the award of fees and costs.

## II.

## DISCUSSION

A.    *Standard of Review*

Anti-SLAPP analysis under Code of Civil Procedure section 425.16 proceeds in two familiar steps. In the first step, the defendant must make " ' "a threshold showing that the challenged cause of action is one 'arising from' protected activity." ' " (*Barry v. State Bar of California* (2017) 2 Cal.5th 318, 321 (*Barry*); *Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 (*Navellier*).) In this context, the term " ' "protected activity" ' " refers to speech or petitioning activities. (*Barry*, *supra*, 2 Cal.5th at p. 321.) If the court finds the defendant

5

succeeds at the first step, then the burden shifts to the plaintiff to " ' "demonstrate[ ] a probability of prevailing on the claim." ' " (*Ibid.*)

A claim arises from protected activity when that activity underlies or forms the basis for the claim. We look to whether " 'the defendant's act underlying the plaintiff's cause of action [was] *itself* . . . an act in furtherance of the right of petition or free speech.' " (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1063, italics added (*Park*).) "[T]he focus is on determining what 'the defendant's activity [is] that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning.' " (*Ibid.*) In teasing out whether we are dealing with protected conduct, "courts should consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability." (*Ibid.*)

At the second step, " '[w]e . . . evaluate the defendants' evidence only to determine if it defeats that submitted by the plaintiff as a matter of law.' [Citation.] '[I]n order to establish the requisite probability of prevailing [citation], the plaintiff need only have " 'stated and substantiated a legally sufficient claim.' " [Citation.] "Put another way, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' " ' [Citation.] . . . That burden [is] not particularly high[.]" (*Area 51 Productions, Inc. v. City of Alameda* (2018) 20 Cal.App.5th 581, 602; see *Navellier*, *supra*, 29 Cal.4th at p. 94 ["claims with the requisite minimal merit may proceed"].)

If the cause of action satisfies both prongs of the anti-SLAPP statute, then it is subject to being stricken. (*Barry*, *supra*, 2 Cal.5th at p. 321.) On appeal, this court reviews a trial court's order granting an anti-SLAPP motion de novo. (*Chodos v. Cole* (2012) 210 Cal.App.4th 692, 698.) Thus, whether a defendant has met his or her burden under the first prong, and if so, whether a plaintiff has shown a probability of prevailing under the second prong, are both questions this court reviews independently on appeal. (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 906.) On de novo review, " '[w]e look at the pleadings and declarations, accepting as true the evidence that favors the plaintiff and

6

evaluating the defendant's evidence " 'only to determine if it has defeated that submitted by the plaintiff as a matter of law.' " ' " (*Lunada Biomedical v. Nunez* (2014) 230 Cal.App.4th 459, 470.)

The trial court's evidentiary rulings at the second step of the anti-SLAPP analysis are generally reviewed for abuse of discretion. (*See Morrow v. Los Angeles Unified School Dist.* (2007) 149 Cal.App.4th 1424, 1444-1446.) But when a trial court excludes evidence because, "even if the plaintiff's allegations were proven, they would not establish a cause of action," that is a legal ruling subject to de novo review. (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 26-28 [evidence excluded based on litigation privilege and parol evidence rule]; see *Condon-Johnson & Associates, Inc. v. Sacramento Municipal Utility Dist.* (2007) 149 Cal.App.4th 1384, 1392 ["when the issue is one of law, we exercise de novo review"].)

B.      *Sagi's Evidentiary Objections*

Preliminarily, we address a series of evidentiary objections raised by Sagi as a threshold matter. He argues that regardless of the merit of the various legal arguments Winslett advances, her appeal must fail because none of the evidence she presented is admissible and thus she cannot meet her burden on the second prong of the anti-SLAPP analysis for any of the three disputed claims. In support of this line of argument, Sagi contends, as he did in the trial court, that the sworn statements in Winslett's declaration and the documents she presented lacked foundation, set forth improper opinions and conclusions, and were hearsay, and that all of her evidence was irrelevant.

These evidentiary issues are easily resolved. We see no abuse of discretion in the trial court's rejection of Sagi's hearsay, lack of foundation, and improper opinion and conclusion objections. Relevance is another matter. On that point, the court sustained Sagi's objection, but it did so on the premise that none of Winslett's evidence has any relevance to claims that are not legally viable as pleaded. For the reasons explained below, we hold that that underlying premise was erroneous. Thus, the exclusion of Winslett's evidence on relevance grounds was erroneous as well.

Since Sagi does not dispute that, if Winslett's evidence is admissible, she met the minimal burden necessary to make a prima facie case supporting the three disputed claims, we turn to his arguments that those claims fail as a matter of law.

C.    *Claims Under Section 1942.5, Subdivision (d)*

Section 1942.5, subdivision (d) provides that "it is unlawful for a lessor to increase rent, decrease services, cause a lessee to quit involuntarily, bring an action to recover possession, or threaten to do any of those acts, for the purpose of retaliating against the lessee because he or she has lawfully organized or participated in a lessees' association or an organization advocating lessees' rights or has lawfully and peaceably exercised any rights under the law."  Subdivision (h) of the statute, in turn, states that "Any lessor or agent of a lessor who violates [section 1942.5] shall be liable to the lessee in a civil action for all of the following:  [¶] (1) The actual damages sustained by the lessee.  [¶] (2) Punitive damages in an amount of not less than one hundred dollars ($100) nor more than two thousand dollars ($2,000) for each retaliatory act where the lessor or agent has been guilty of fraud, oppression, or malice with respect to that act."  The landlord can defend against an action for retaliatory eviction by showing that it acted "for any lawful cause" (§ 1942.5, subd. (f)) or "in good faith" (*id.*, subd. (g)).[6]

---

[6] There are two sets of remedial provisions in section 1942.5.  First, subdivision (a) prohibits certain acts by a landlord if they occur within 180 days of the tenant making specified complaints (§ 1942.5, subd. (a)(1)-(2)) or of specified events occurring (*id.*, subd. (a)(3)-(5)).  Second, subdivision (d) provides that certain retaliatory acts by a landlord are illegal.  While subdivision (a) and subdivision (d) are somewhat different in scope— most obviously because only a tenant who is not in default on her rent may invoke subdivision (a)—subdivision (h) makes "[a]ny lessor . . . who violates this section . . . liable to the lessee in a civil action."  Because subdivision (h) applies broadly to any violation of "*this section*" (italics added), which of course includes subdivision (a), civil actions for damages appear to be available for violation of subdivision (a), as well as subdivision (d).

Without setting out an argument by separate heading, Winslett suggests as an aside in her opening brief that her eighth and fifteenth claims are supported by subdivision (a) as well as subdivision (d).  But she does not explain why she is entitled to invoke subdivision (a) even though the eviction here was indisputably based on nonpayment of rent.  Perhaps she would argue that she was current on her rent when the specific violations of section 1942.5, subdivision (a) she alleges took place; or perhaps she would take the position that

Winslett's eighth cause of action for retaliation and fifteenth cause of action for retaliatory eviction both rest on section 1942.5, subdivision (d), as asserted in a "civil action" under subdivision (h). Each claim incorporates by reference the same factual background allegations, which include events encompassing the entire history of Sagi's alleged indifference to Winslett's complaints about dilapidated conditions; her complaint to Vector Control; Sagi's irate response; and Sagi's continued refusal to make meaningful repairs after the visit from Vector Control, finally culminating in his serving a notice to quit and filing an unlawful detainer action. Specifically, in paragraph 15 of the first amended complaint, Winslett alleges that "On or about January 21, 2015, [Sagi] filed an unlawful detainer lawsuit seeking to evict [her] from the Subject Premises."

The filing of an unlawful detainer complaint is anti-SLAPP protected activity, as is service of a notice of termination preceding an unlawful detainer complaint. (*Clark v. Mazgani* (2009) 170 Cal.App.4th 1281, 1286 (*Clark*); *Birkner v. Lam* (2007) 156 Cal.App.4th 275, 281-282.) Because Winslett concedes that the eighth and fifteenth claims are founded on protected activity—as she must in the face of this precedent, since "bring[ing] an action to recover possession" and "threaten[ing] to" bring such an action by notice to quit are elements of these claims, as pleaded (see Civ. Code, § 1942.5, subd. (d))—our examination of the trial court's order striking them will focus on the court's second prong conclusion that she failed to demonstrate a probability of prevailing.

---

the alleged uninhabitability of her apartment vitiated her rent obligation. We do not know, and we will not endeavor to guess. Arguments not raised by a separate heading in an opening brief will be deemed waived. (See Cal. Rules of Court, rule 8.204(a)(1)(B); *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830-1831, fn. 4 ["The failure to head an argument as required by California Rules of Court . . . constitutes a waiver"]; *Heavenly Valley v. El Dorado County Bd. of Equalization* (2000) 84 Cal.App.4th 1323, 1345, fn. 17 ["Each point in an appellate brief should appear under a separate heading, and we need not address contentions not properly briefed"].) We will therefore treat the eighth and fifteenth claims as having been made solely under section 1942.5, subdivision (d).

We first address whether the trial court was correct to rule that the litigation privilege applies to claims brought under section 1942.5, subdivision (d), a topic that, according to Winslett, presents "[t]he most important question in this case."

1. *Statutory History*

We begin by tracing the origins of the statute. The statutory cause of action now embodied in section 1942.5, subdivisions (d) and (h), was not always included in section 1942.5. As originally enacted in 1970, section 1942.5 was "part of comprehensive landlord-tenant reform legislation. Assembly Bill No. 2033, 1970 Regular Session (Stats. 1970, ch. 1280) [AB 2033] amended section 1942 and added sections 1941.1, 1941.2, 1942.1 and 1942.5. [AB 2033] established the statutory retaliatory eviction defense (§ 1942.5) . . . specified the conditions which rendered a dwelling 'untenantable' (§ 1941.1), enunciated tenants' responsibilities (§ 1941.2), clarified tenants' rights to make repairs themselves and deduct the cost from their rent (§ 1942), and prohibited the waiver of tenants' statutory rights (§§ 1942.1; 1942.5, subd. (c))." (*Kriz v. Taylor* (1979) 92 Cal.App.3d 302, 310-311.) What eventually became the current statutory cause of action for retaliatory eviction, which was added to this scheme by amendment in 1979, had its genesis in common law developments independent of section 1942.5.

These common law developments began nearly simultaneously with the enactment of section 1942.5, in *Schweiger v. Superior Court* (1970) 3 Cal.3d 507, 513 (*Schweiger*), a case involving an eviction predating enactment of the statute. There, a tenant who paid $75 per month in rent complained to his landlord about dilapidated conditions, and in response, the landlord increased his rent to $125 per month and then evicted him. (*Id.* at p. 510.) Our Supreme Court held that a retaliatory eviction defense was available in the eviction proceedings, independent of section 1942.5. Borrowing heavily from *Edwards v. Habib* (D.C. Cir. 1968) 397 F.2d 687 (*Edwards*), the *Schweiger* court grafted the holding in *Edwards* onto California law: " '[W]hile the landlord may evict for any legal reason or for no reason at all, he is not, we hold, free to evict in retaliation for his tenant's report of housing code violations to the authorities. As a matter of statutory construction and for

10

reasons of public policy, such an eviction cannot be permitted.' " (*Schweiger*, *supra*, at pp. 512-513.)

Less than a year later, the same landlord surfaced again in *Aweeka v. Bonds* (1971) 20 Cal.App.3d 278, a Court of Appeal case that also involved a pre-section 1942.5 eviction. The *Aweeka* case was a virtual replay of *Schweiger*, *supra,* 3 Cal.3d. 507, but in a slightly different procedural posture. There, a group of tenants demanded the repair of dilapidated conditions, and for that, their rent was raised from $75 to $145 per month. Instead of waiting to be sued in an unlawful detainer action, they sued for retaliatory eviction. They lost on demurrer. Reversing, the Court of Appeal extended *Schweiger* to authorize an affirmative claim for damages. The court explained: "We can discern no rational basis for allowing . . . a substantive defense while denying an affirmative cause of action. It would be unfair and unreasonable to require a tenant, subjected to a retaliatory rent increase by the landlord, to wait and raise the matter as a defense only, after he is confronted with an unlawful detainer action and a possible lien on his personal property. . . . Accordingly, we conclude on the authority of *Schweiger* that the complaint stated a cause of action for retaliatory eviction." (*Aweeka*, *supra*, at p. 281.)

Following *Schweiger,* 3 Cal.3d. 507, there was some uncertainty as to whether AB 2033 took up the field and provided an exclusive set of tenant-protection remedies. *Green v. Superior Court* (1974) 10 Cal.3d 616 supplied the answer. In that case, the high court held that there is an implied warranty of habitability in residential leases and that damages may be recovered if a breach of the warranty is proved. "Although past cases have held that the Legislature intended the remedies afforded by section 1942 to be the sole procedure for enforcing the statutory duty on landlords imposed by section 1941," the *Green* court explained, "no decision has suggested that the Legislature designed these statutory provisions to displace the common law in fixing the respective rights of landlord and tenant. On the contrary, the statutory remedies of section 1942 have traditionally been viewed as additional to, and complementary of, the tenant's common law rights." (*Green*, *supra*, at pp. 629-630.)

11

Two years after its decision in *Green v. Superior Court, supra*, 10 Cal.3d 616, the high court went a step further in *S.P. Growers Assn. v. Rodriguez* (1976) 17 Cal.3d 719 (*S.P. Growers*), a retaliation case that had nothing to do with tenantability. *S.P. Growers* created a variant of the *Schweiger* rule for retaliation against the exercise of legally protected rights. The landlord in that case was a corporate agricultural employer who evicted migrant farmworker tenants for bringing suit against it to enforce their rights under the federal Farm Labor Contractor Registration Act. Upholding the tenants' right to claim retaliation in these circumstances, the court concluded that "the holding in *Schweiger* [, *supra*, 3 Cal.3d 507] cannot be limited to the narrow proposition that tenants are protected from retaliation only when they take action concerning the conditions of their tenancy." (*S.P. Growers*, *supra*, at p. 728.) Regardless of whether the statutory rights a tenant seeks to exercise are created by Congress or the Legislature, "the crucial question" is whether the statutory policy being vindicated "depends for its effectiveness on private initiative and would thus be emasculated by allowing punitive eviction." (*Ibid*.)[7]

In 1979, the Legislature repealed and reenacted section 1942.5, at that point adding the statutory cause of action that we now see in current subdivisions (d) and (h). (See section 1942.5, former subds. (c), (f), as enacted by Stats. 1979, ch. 652, § 2, pp. 2005-

---

[7] For its holding, the high court relied on two lines of precedent. First, the court cited *Abstract Investment Co. v. Hutchinson* (1962) 204 Cal.App.2d 242, a case that applied equal protection principles drawn from *Shelley v. Kraemer* (1948) 334 U.S. 1 in circumstances where "a tenant contended . . . he was being evicted for racial reasons. Although such a complaint did not relate directly to the conditions of tenancy, the Court of Appeal held that a landlord may not permissibly invoke the power of a court to evict a person because of his color." (*S.P. Growers, supra,* 17 Cal.3d at p. 728.)

Second, the court drew on authority from a wholly different context, but one presenting similar considerations to those at issue with landlord retaliation against tenants. Citing the seminal employee termination in violation of public policy case (*Petermann v. International Brotherhood of Teamsters* (1959) 174 Cal.App.2d 184 [employer's otherwise unfettered right of at-will termination does not permit termination of employee for his refusal to commit perjury]), the court said that landlord retaliation can cross a similar line. "[S]uch cases 'instruct us that one may not exercise normally unrestricted power if his reasons for its exercise contravene public policy.' " (*S.P. Growers, supra,* 17 Cal.3d at p. 728.)

12

2006; § 1942.5, subds. (d), (h), as amended by Stats. 2017, ch. 489, § 6, No. 6 West's Cal. Legis. Service, pp. 3720-3721.) Taking common law rights recognized by the high court over the preceding decade as a foundation, the Legislature enlarged and built upon the limited scheme of statutory remedies it had first created in AB 2033.[8] *Barela v. Superior Court* (1981) 30 Cal.3d 244 (*Barela*) was the first case to come before the court under section 1942.5, as so amended. The tenant in *Barela* faced eviction proceedings after reporting a landlord's sexual molestation of her daughter to the police. The trial court ruled that the eviction was not barred by section 1942.5 or by the standards of *S.P. Growers*. Drawing upon *Edwards* as a bellwether—as *Schweiger* did (*Schweiger*, *supra*, 3 Cal.3d at p. 512), and as *S.P. Growers* did (*S.P. Growers*, *supra*, 17 Cal.3d at p. 725)—the court granted writ relief.

Over the landlord's objection that extending *S.P. Growers* would hinder the summary eviction process, the *Barela* court explained that " '[s]ome delay, of course, is inherent in any fair-minded system of justice. . . . Our courts were never intended to serve as rubber stamps for landlords seeking to evict their tenants, but rather to see that justice be done before a man (or woman) is evicted from his (or her) home.' " (*Barela*, *supra*, 30 Cal.3d at p. 244.) The court concluded that "[t]his case is an even stronger one than *S.P. Growers* . . . wherein this court stressed the importance of preventing retaliatory evictions . . . [through] a remedial scheme [that] depends upon private initiative for enforcement. . . . [¶] The strong public policy interests in preserving the summary nature of the unlawful detainer proceeding will not be significantly impaired if the affirmative defense of retaliatory eviction is allowed here." (*Barela*, *supra*, 30 Cal.3d at p. 244.)

*Barela* also put to rest any remaining "notion that the common law retaliatory eviction defense was preempted by statute," thereby definitively confirming that "California

---

[8] See section 1942.5, former subdivision (h), as enacted by Statutes 1979, chapter 652, section 2, page 2006 ["[t]he remedies provided by this section shall be in addition to any other remedies provided by statutory or decisional law"]; section 1942.5, subdivision (j), as amended by Statutes 2017, chapter 489, section 6, No. 6 West's California Legislative Service, page 3721.

has two parallel and independent sources for the doctrine of retaliatory eviction." (*Glaser v. Meyers* (1983) 137 Cal.App.3d 770, 775.) In interpreting section 1942.5, the court was expansive, emphasizing the "important public policies" the remedies authorized by that statute serve. Section 1942.5, the court said, "is a remedial statute aimed at protecting tenants from certain types of abuses" (*Barela*, *supra*, 30 Cal.3d at p. 251), and "[i]mplicit in the passage of any remedial legislation is a general intent to protect from intimidation those who report violations of the law." (*Id*. at p. 252.) Thus, section 1942.5 is to be " 'liberally construed to effect its objectives and to suppress, not encourage, the mischief at which it was directed.' " (*Barela*, *supra*, at p. 251.)

### 2. *Action Apartment v. City of Santa Monica*

Turning specifically to whether the litigation privilege defeats Winslett's claims under section 1942.5, subdivision (d), *Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232 (*Action Apartment*) provides the framework for analysis. At issue in that case was the City of Santa Monica's Tenant Harassment Ordinance, which prohibited, among other things, maliciously serving a notice of eviction or bringing any action to recover possession of a rental unit without a reasonable factual or legal basis. (*Id.* at p. 1237.) Violation of this prohibition was subject to both criminal and civil penalties, with civil enforcement available to " '[a]ny person.' " (*Id.* at p. 1239.) The case was a class action by landlords seeking to have Santa Monica Municipal Code section 4.56.020, subdivision (i)(1) declared invalid on preemption grounds, and among the statutes cited as having preemptive effect was section 47, subdivision (b), which embodies the litigation privilege. (*Action Apartment*, *supra*, at pp. 1239-1240.)

The text of section 47, subdivision (b), "provides that a 'publication or broadcast' made as part of a 'judicial proceeding' is privileged. This privilege is absolute in nature, applying 'to *all* publications, irrespective of their maliciousness.' [Citation.] 'The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that [has] some connection or logical relation to the action.' [Citation.] The privilege 'is not limited to statements made during a trial or other

14

proceedings, but may extend to steps taken prior thereto, or afterwards.' [Citation.]" (*Action Apartment*, 41 Cal.4th at p. 1241.)

Traditionally, the privilege has been given "a broad interpretation" in order to achieve its " 'principal purpose' " to afford litigants and witnesses " 'the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions.' " (*Action Apartment*, 41 Cal.4th at p. 1241.) "[C]ourts have emphasized the importance of the litigation privilege's absolute protection of access to the courts, while recognizing that this absolute protection has its costs," since, inevitably, its invocation will sometimes shield " ' "the shady practitioner" ' " along with the honest ones. (*Id.* at p. 1244.) " '[I]n immunizing participants from liability for torts arising from communications made during judicial proceedings, the law places upon litigants the burden of exposing during trial the bias of witnesses and the falsity of evidence, thereby enhancing the finality of judgments and avoiding an unending roundelay of litigation, an evil far worse than an occasional unfair result.' " (*Ibid.*)

Applying these principles, the high court in *Action Apartment* held that to the extent the challenged ordinance covers the filing of an eviction action ("bringing 'any action to recover possession of a rental housing unit based upon facts which the landlord had no reasonable cause to believe to be true or upon a legal theory which is untenable under the facts known to the landlord' "), it conflicts with and is entirely preempted by the litigation privilege. (*Action Apartment*, 41 Cal.4th at pp. 1249-1250.) But to the extent the ordinance covers prelitigation service of an eviction notice (malicious " '*service of any notice to quit or other eviction notice*' "), it conflicts with the litigation privilege "only in part." (*Id.* at p. 1250.) In this latter respect, the ordinance might, or might not, conflict with the litigation privilege, depending on whether the notice in question genuinely "relates to litigation that is contemplated in good faith," which is a "factual inquiry." (*Id.* at pp. 1251-1252.)

The *Action Apartment* court was careful to note that the Legislature remains free to create "exceptions to the litigation privilege based on irreconcilable conflicts between the privilege and other coequal state laws." (*Action Apartment*, 41 Cal.4th at p. 1247.) Bearing in mind that "the distinction between state and local laws" is "[f]undamental to the doctrine

15

of preemption," the court explained that "local governments lack the authority to craft their own exceptions to general state laws." (*Ibid*.) By contrast, the court cited a list of illustrative cases where it found statutory exceptions to the litigation privilege. (*Id.* at p. 1246.) "[O]ur recognition of . . . [such] exceptions," the court said, "has been guided by the 'rule of statutory construction that particular provisions will prevail over general provisions.' " (*Ibid*.) In each case, the statute involved was "more specific than the litigation privilege and would be significantly or wholly inoperable if its enforcement were barred when in conflict with the privilege." (*Ibid*.)

### 3. *Litigation Privilege Must Yield to Section 1942.5*

Because the scheme of retaliatory eviction remedies in section 1942.5 meets the test of specificity set out in *Action Apartment* and would be rendered significantly inoperative if the litigation privilege were to apply, we agree with our Second District, Division One colleagues in *Banuelos v. LA Investment, LLC* (2013) 219 Cal.App.4th 323 (*Banuelos*) that section 1942.5, subdivisions (d) and (h)—in *Banuelos*, former subdivisions (c) and (f)— create an exception to the litigation privilege. "The statute's reference to a landlord's liability 'in a civil action' for bringing 'an action to recover possession' in retaliation for a tenant's exercise of rights coupled with the provision recognizing a good faith defense 'at the trial or other hearing' demonstrates that the Legislature intended to create a cause of action for retaliatory eviction that is not barred by the litigation privilege. If the litigation privilege trumped a suit for retaliatory eviction under section 1942.5 the privilege would ' "effectively immunize conduct that the [statute] prohibits" ' [citation], thereby encouraging, rather than suppressing, ' "the mischief at which it was directed. [Citation.]" ' " (*Banuelos*, *supra*, at p. 332.)

Section 1942.5, subdivisions (d) and (h) are not only more specific than section 47, subdivision (b), they are also later enacted. Section 47 was enacted in 1872 (and was amended in 1873-1874 to specify a privileged publication is one made " 'in any legislative or judicial proceeding, or in any other official proceeding authorized by law' ") (see Historical and Statutory Notes, 6 West's Ann. Civ. Code (2007 ed.) foll. § 47, p. 303), predating the statutory retaliatory eviction cause of action in section 1942.5 by more than a

16

century.  Bearing in mind both principles of construction (see *Collection Bureau of San Jose v. Rumsey* (2000) 24 Cal.4th 301, 310 ["[i]f conflicting statutes cannot be reconciled, later enactments supersede earlier ones . . . and more specific provisions take precedence over more general ones"]), we conclude that the Legislature must have been fully aware of the existing litigation privilege and intended to override it when it authorized an affirmative cause of action to combat retaliatory eviction.  To justify a contrary conclusion, we would have to believe that the Legislature "intended to do a useless act."  (*Banuelos*, *supra*, 219 Cal.App.4th at p. 335.)

The statutory history traced above, intertwined with the parallel common law developments out of which the statute arose, provides considerable support for this conclusion.  Section 1942.5, subdivisions (d) and (h) seek to vindicate policies that "depend[] for [their] effectiveness on private initiative and would thus be emasculated by allowing punitive eviction."  (*S.P. Growers*, *supra*, 17 Cal.3d at p. 728.)  By building upon the common law doctrine of retaliatory eviction, the Legislature embraced the high court's recognition of the vital importance of private enforcement in this arena.  What makes the affirmative statutory claim for retaliatory eviction more potent as an enforcement tool than the defense of retaliatory eviction is precisely the fact that, at the tenant's option, it may be asserted independently—as Winslett chose to do here—outside of summary eviction proceedings.  Presumably, the Legislature recognized this and chose to create an affirmative cause of action because it viewed the opportunity to raise the issue of retaliatory eviction by way of defense as inadequate, given the inherent constraints of summary eviction proceedings.[9]

---

[9] In unlawful detainer proceedings tenants are not allowed to file cross-complaints. (*Knowles v. Robinson* (1963) 60 Cal.2d 620, 625–627.)  And "[a]s a practical matter, the freedom to engage in 'liberal' discovery is far narrower in [unlawful detainer] proceedings than in general civil actions."  (Friedman et al., Cal. Practice Guide: Landlord-Tenant (The Rutter Group 2017), ¶ 8:436.)  Accelerated discovery and other deadlines "severely limit the time the parties have to complete their discovery and thus, necessarily, limit the discovery *options* available to [unlawful detainer] litigants."  (*Ibid.,* citing Code Civ. Proc., §§ 1170.8 [discovery motions on five days' notice], 1170.7 [summary judgment on five

The litigation privilege is "not without limit," as the *Action Apartment* court took pains to point out. (*Action Apartment*, *supra*, 41 Cal.4th at p. 1242.) Because recognition of the privilege here would neuter section 1942.5 by removing eviction from the statutory remedy of retaliatory eviction, we view the clash between section 47, subdivision (b), on the one hand, and section 1942.5, subdivisions (d) and (h), on the other, as irreconcilable. To be consistent with the high court's guidance that we give section 1942.5 a liberal construction designed to achieve the legislative purpose, we conclude that the litigation privilege must yield to it. (*Barela*, *supra*, 30 Cal.3d at p. 251; *Banuelos*, *supra*, 219 Cal.App.4th at p. 331; *cf. Komarova v. National Credit Acceptance, Inc.* (2009) 175 Cal.App.4th 324, 340 ["The Legislature presumably would not have included" protections against specific kinds of litigation abuse by debt collectors under the Robbins-Rosenthal Fair Debt Collection Practices Act "if it intended for the privilege to apply. . . . [T]he Act is 'a remedial statute [that] should be interpreted broadly in order to effectuate its purpose' "].)

### 4. Feldman *and* Wallace

Sagi insists that section 47, subdivision (b) applies to Winslett's eighth and fifteenth causes of action, citing two cases, both from this District, one from Division Two, *Feldman v. 1100 Park Lane Associates* (2008) 160 Cal.App.4th 1467 (*Feldman*), and one from Division Five, *Wallace v. McCubbin* (2011) 196 Cal.App.4th 1169 (*Wallace*), disapproved of on other grounds in *Baral v. Schnitt* (2016) 1 Cal.5th 376, 396, footnote 11. *Feldman* was a case involving a luxury apartment in a building known as the Park Lane, at 1100 Sacramento Street in San Francisco. (*Feldman*, at p. 1473.) The Feldmans, a couple moving to the west coast from New York, attempted to sublet an apartment in the Park Lane and were told by Seigel, an attorney for the landlord, that their sublease application was conditionally approved, but they moved in only to discover that the landlord had not in fact approved the sublease and wanted substantially increased rent as the price of his assent. (*Id.* at pp. 1473-1474.) After what they claimed were harassing visits from a man named

days' notice], and 1170.5 [trial setting 20 days after request].)

18

Hawkins who described himself as a " 'trouble shooter' " for the landlord, the Feldmans were served with a notice to quit and then named in an unlawful detainer action. (*Id.* at pp. 1474-1475.) Rather than fight the case, they moved elsewhere, mooting the unlawful detainer complaint. (*Id.* at p. 1475.)

The appeal in *Feldman* involved the Feldmans' cross-complaint for damages in the unlawful detainer action, by which they asserted seven claims, including a retaliatory eviction claim under section 1942.5, former subdivision (c). (*Feldman*, *supra*, 160 Cal.App.4th at pp. 1475-1476, 1492-1494.) On the landlord's anti-SLAPP motion, the trial court struck this claim, and on appeal, our Division Two colleagues affirmed. (*Id.* at pp. 1473, 1476, 1498.) The panel held, first, in step one of the anti-SLAPP analysis, that the gravamen of the Feldmans' claims was protected conduct (*Feldman*, at pp. 1478-1484), and second, in step two, that none of the claims was likely to succeed, in part because the "Park Lane cross-defendants have produced evidence that Hawkins's statements, the service of the notice to quit and the unlawful detainer action were shielded by the litigation privilege." (*Id*. at p. 1491.) Although section 47, subdivision (b) was one of the grounds cited for the court's holding on likelihood of success (*Feldman*, at pp. 1485, 1491), nowhere in its opinion is any consideration given to whether section 1942.5, former subdivision (c) should be recognized as an exception to the litigation privilege.

*Wallace*, another anti-SLAPP case involving a statutory retaliatory eviction claim, adopts the same holding without independent analysis. (*Wallace*, *supra*, 196 Cal.App.4th at pp. 1214-1215.) Of *Wallace*, the *Banuelos* court observes that, "[l]ike *Feldman, . . .* [it] did not discuss or analyze *Action Apartment* and the litigation privilege nor did it distinguish between a city ordinance and a state statute when resolving the conflict issue." (*Banuelos*, *supra*, 219 Cal.App.4th at p. 333.) Although it is probably an overstatement to say that neither case discusses or analyzes *Action Apartment*—that is true of *Wallace*, but *Feldman* does address *Action Apartment* at some length (*Feldman*, *supra*, 160 Cal.App.4th at pp. 1486-1487)—the problem with *Feldman* is that its analysis is incomplete. It discusses *Action Apartment* but never considers the issue of conflict with a coequal statute, a key limiting principle to the *Action Apartment* holding. The reasoning in *Wallace* is even more

truncated. In a discussion dealing with a rent ordinance claim (*Wallace, supra*, at pp. 1212-1213), it string cites *Action Apartment*, *Feldman*, and *Bisno v. Douglas Emmett Realty Fund 1988* (2009) 174 Cal.App.4th 1534—a case that does not involve the issue of statutory conflict or section 1942.5—and then later, in a brief section dealing separately with the retaliatory eviction claim (*Wallace,* at pp. 1214-1215), refers back to its prior rent ordinance discussion, finally concluding with the categorical announcement that bringing an eviction action and serving a notice to quit are "acts . . . subject to the absolute privilege of Civil Code section 47, subdivision (b)." (*Id.* at p. 1215.) Suffice it to say we find neither of these cases persuasive. Instead, we opt to follow the more recent and in our view better reasoned opinion in *Banuelos*.

          5.       Agreement to Vacate

Separate and apart from his litigation privilege argument, Sagi argues that Winslett cannot establish a claim for retaliatory eviction under section 1942.5, subdivision (d) because she was not evicted. Drawing on *Banuelos* for what little assistance it might offer him here, Sagi cites a portion of the *Banuelos* opinion holding that "[a plaintiff] cannot state a *common law* cause of action for retaliatory eviction because that cause of action applies only to conduct that causes the tenant to involuntarily vacate the premises." (*Banuelos, supra,* 219 Cal.App.4th at p. 328, italics added.) In *Banuelos*, the court ruled that while a common law cause of action requires actual eviction, a claim under section 1942.5 does not. (*Banuelos,* at pp. 328, 336.) In this case, on the other hand, Winslett's claim for retaliatory eviction is based on section 1942.5, subdivision (d), not common law, so Sagi's attempt to apply *Banuelos* in his favor misses the mark.

Citing *Drouet v. Superior Court* (2003) 31 Cal.4th 583 (*Drouet*), Sagi adds a twist to this line of argument, based on proviso language in section 1942.5, former subdivision (d), stating that " '[n]othing in this section shall be construed as limiting in any way the exercise by the lessor of his [or her] rights under any lease *or agreement* or any law pertaining to the hiring of property or his [or her] right to do any of the acts described in subdivision[s] (a) or [former] (c) for any lawful cause.' " (*Drouet, supra,* at p. 592, italics added, citing

20

§ 1942.5, former subd. (d).)[10]   He argues that, given the proviso insulating landlord actions undertaken by "agreement," Winslett cannot make out a statutory retaliatory eviction claim because she *agreed* to abandon her tenancy.  The argument is mistaken.  Only lawful eviction proceedings are protected by former subdivision (d), while retaliatory eviction is not.  Both section 1942.5, former subdivision (f) and its current embodiment in section 1942.5, subdivision (h) state that "[a]ny lessor or agent of a lessor who violates this section shall be liable to the lessee in a civil action."

*Drouet* does not compel a contrary conclusion.  In that case, a landlord filed an Ellis Act unlawful detainer action in what he claimed was an effort to withdraw his rental unit from the market, and his tenants raised a defense of retaliatory eviction.  In writ of mandate proceedings posing the question whether tenants facing eviction pursuant to the Ellis Act may raise such a defense, the high court answered, yes, they may, but the landlord may rebut such a defense upon proof of a bona fide intent to withdraw the rental unit from the market as an action undertaken "for any lawful cause" under section 1942.5, former subdivision (d).  (*Drouet*, *supra*, 31 Cal.4th at pp. 594, 599-600.)  Here, unlike the situation in *Drouet*, where the landlord contended he filed an unlawful detainer action *because* he believed it was lawful to do so under the Ellis Act, all of the retaliatory conduct at issue took place *before* the settlement of the unlawful detainer action.  Whatever explanations Sagi may have for his claimed retaliatory conduct, he cannot justify it by pointing to an agreement he had yet to make.  Nor could Winslett's agreement to move out somehow retroactively cloak Sagi's prior actions with "lawful cause," at least not in the absence of a release extinguishing claims for prior conduct.  When the unlawful detainer action at issue in this case settled, Sagi had the ability to seek such a release if he wished to avoid further controversy, but for whatever reason he failed to do so.

---

[10] Section 1942.5, former subdivision (d) has been recodified in section 1942.5, subdivision (f), with some changes in wording that are not material here.  (See Stats. 2017, ch. 489, § 6, No. 6 West's Cal. Legis. Service, p. 3720.)

D.    *Claim Under The Oakland Just Cause For Eviction Ordinance*

Having determined that Winslett has shown a likelihood of prevailing on her claims under section 1942.5, subdivision (d), we turn now to her tenth cause of action for violation of the Just Cause Ordinance.  In her first amended complaint, Winslett alleges that Sagi violated the Just Cause Ordinance by wrongfully endeavoring to recover possession of her apartment, failing to make repairs, serving her with "misleading notices," attempting to trick her into moving out without just cause, and not advising her of her right to contact the rent board.

The Just Cause Ordinance provides that "[n]o landlord shall endeavor to recover possession, issue a notice terminating tenancy, or recover possession of a rental unit in the city of Oakland unless the landlord is able to prove the existence of one of the following grounds."  (Oakland Mun. Code, § 8.22.360, subd. (A).)  Among the stated grounds for eviction is when "[t]he tenant has failed to pay rent to which the landlord is legally entitled pursuant to the lease or rental agreement and under provisions of state or local law, and said failure has continued after service on the tenant of a written notice correctly stating the amount of rent then due and requiring its payment within a period, stated in the notice, of not less than three days.  However, this subsection shall not constitute grounds for eviction where tenant has withheld rent pursuant to applicable law."  (Oakland Mun. Code, § 8.22.360, subd. (A)(1).)

The Just Cause Ordinance also states that "[a] landlord shall not endeavor to recover possession of a rental unit unless" a permitted ground for eviction is set forth "in the notice and that ground is the landlord's dominant motive for recovering possession and the landlord acts in good faith in seeking to recover possession."  (Oakland Mun. Code, § 8.22.360, subd. (B)(2).)  Additionally, a notice terminating a tenancy must include "[a] statement that advice regarding the notice terminating tenancy is available from the Rent Board."  (Oakland Mun. Code, § 8.22.360, subd. (B)(6)(b).)  Finally, "[w]henever a landlord . . . wrongfully endeavors to recover possession or recovers possession of a rental unit in violation of Subsection 6(A) [8.22.360 A], the tenant . . . may institute a civil proceeding for . . . money damages of not less than three times actual damages (including

22

damages for mental or emotional distress), and whatever other relief the court deems appropriate. . . ." (Oakland Mun. Code, § 8.22.370, subd. (A)(2), brackets in original.)

As noted above, the filing of an unlawful detainer action and the service of a notice to quit are acts arising from protected activity under the anti-SLAPP statute. " 'But the mere fact an action was filed after protected activity took place does not mean it arose from that activity.' [Citation.] 'Moreover, that a cause of action arguably may have been "triggered" by protected activity does not entail that it is one arising from such. [Citation.] In the anti-SLAPP context, the critical consideration is whether the cause of action is *based on* the defendant's protected free speech or petitioning activity. [Citations.]' " (*Ulkarim v. Westfield LLC* (2014) 227 Cal.App.4th 1266, 1275; *Clark*, *supra*, 170 Cal.App.4th at p. 1284.) The Just Cause Ordinance "permits a tenant to recover damages for . . . a range of conduct that does not *necessarily* include filing a lawsuit to recover possession" (*Rental Housing Assn. of Northern Alameda County v. City of Oakland* (2009) 171 Cal.App.4th 741, 767), and here Winslett chose to avoid basing her claim on the eviction itself. The tenth cause of action focuses on the *reasons* Sagi "endeavor[ed] to recover possession" (see Oakland Mun. Code, § 8.22.360, subds. (A), (B)(2)), not on the eviction proceedings. (See *Clark*, *supra*, 170 Cal.App.4th at p. 1284 [allegation of fraud against landlord in suit by tenant for retaliatory eviction, where landlord lied about his intent to move a relative into rental unit subject to rent control and then evicted the tenant under the Ellis Act, thereby allowing the rent to be raised to market level, does not arise out of anti-SLAPP protected activity].)

Unlike her section 1942.5 claims as pleaded in the eighth and fifteenth causes of action, Winslett grounds her tenth cause of action on Sagi's retributive tactics *prior* to the eviction proceedings. While Winslett's section 1942.5 claims incorporate and replead all of the background allegations in her first amended complaint, including paragraph 15—which alleges the initiation of unlawful detainer proceedings as the culminating act—the background allegations incorporated into her tenth cause of action omit that paragraph. Sagi tries to argue around the careful framing of this claim by selectively focusing on a vague reference in it to "misleading notices," an allegation he contends can only refer to the

23

notice to quit, which marked the formal initiation of the unlawful detainer process. But that reading of Winslett's claim for violation of the Just Cause Ordinance seems to us a stretch. Whatever she may have meant in referring to "misleading notices," we do not understand it as shorthand to reallege what she deliberately skipped over by omitting paragraph 15.

Ultimately, Sagi's position on the tenth cause of action rests on the argument that, in a brief filed in support of a discovery motion, Winslett admitted that this claim is based on the filing of an unlawful detainer action. Winslett does not deny that, in substance, her lawyers said as much in the offending brief, but she characterizes the language they used to describe the tenth cause of action there as an "unintentionally broad misstatement" that has no legal effect. This issue, in our view, is nothing but a distraction. We are not impressed by Sagi's attempt to draw Winslett into a debate over what was or was not meant by statements in a collateral discovery motion that is not under review in this appeal. The basis for invoking rules barring a party from taking inconsistent positions in litigation is wholly lacking. The doctrine of judicial estoppel cannot be invoked where the position first assumed was taken as a result of ignorance or mistake (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 182), and the related doctrine of equitable estoppel only applies to the intentional assertion of an inconsistent position. (*Ibid*.) Sagi makes no attempt to argue that either species of estoppel applies.

In the sole case on which Sagi relies, *Brown v. Boren* (1999) 74 Cal.App.4th 1303, the appellant tried and lost fraud and breach of fiduciary duty claims in a bench trial, and then sought to base her appeal on a contract theory, representing to the appellate court that she tried the case on contract as well as tort theories. (*Id.* at pp. 1308-1310, 1313, 1316-1317.) Finding that representation not borne out by the record, the appellate court refused to allow the change of position. (*Id.* at pp. 1316-1317, 1320.) This is plainly a different situation from what we have here. It is one thing for a party to shift positions on appeal when the change is to the basis of the ruling under review, thereby depriving the trial court of the opportunity to correct error in the first instance. It is quite another when the change relates to some collateral ruling not under review. In that circumstance—which is this

case—we enforce consistency only when the rules of judicial or equitable estoppel demand it.

Accordingly, we conclude that the gravamen of Winslett's tenth cause of action is not rooted in the unlawful detainer action, in the notice to quit, or in any other protected free speech or petitioning activity, but rather lies in the broader circumstances surrounding the eviction, in particular all of the alleged pressure tactics designed to force Winslett to abandon her apartment and cease making complaints about tenantability. Because Winslett's Just Cause Ordinance claim does not arise out of protected activity, there were no grounds for striking it under the anti-SLAPP statute.

## III.

## CONCLUSION AND DISPOSITION

The trial court erred in striking Winslett's eighth, tenth and fifteenth causes of action under Code of Civil Procedure section 425.16, subdivision (b). We therefore reverse the order granting Sagi's anti-SLAPP motion, as well as the accompanying award of attorney fees and costs.

_____
Streeter, Acting P.J.

We concur:


_____
Reardon, J.


_____
Schulman, J.*

* Judge of the Superior Court of California, City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A146932/ *Winslett v. 1811 27th Avenue LLC*

| | |
|---|---|
| Trial Court: | Alameda County Superior Court |
| Trial Judge: | Honorable Stephen M. Pulido |
| Counsel for Appellant: | Siegel & Callahan, Caleb Andrew Rush; Law Offices of Andrew Wolff, Andrew Wolff, Chris Beatty, Sheena Patel, Wortham Briscoe |
| Counsel for Amici Curiae for Appellant: | City of Berkeley, Rent Stabilization Board, Matthew Brown; Centro Legal de la Raza, Martina Ines Cucullu Lim; East Bay Community Law Center, Ubaldo Fernandez |
| Counsel for Respondent: | Burnham Brown, Charles Anthony Alfonzo, Michelle Denise Jew, Brian R. Thompson |

*Winslett v. 1811 27th Avenue* (A146932)