Filed 12/12/25  Washington v. Stein CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| EARL J. WASHINGTON et al.,<br><br>　　Plaintiffs and Appellants,<br><br>　　v.<br><br>CHARLIE Z. STEIN et al.,<br><br>　　Defendants and Respondents. | B343990<br>(Los Angeles County<br>Super. Ct. No.<br>22STCV03806) |

APPEAL from an order of the Superior Court of Los Angeles County, Theresa M. Traber, Judge.  Affirmed.

Earl J. Washington, in pro per., and for Plaintiff and Appellant Lola Mitsuk.

Davidovich Stone Law Group, Niv V. Davidovich, and Jodi C. Rosner for Defendants and Respondents.

\* \* \* \* \* \*

Plaintiffs Earl Washington and Lola Mitsuk (collectively, plaintiffs) sued their current landlord's attorneys based on emails those attorneys sent communicating their clients' refusal to lease a different unit in the same complex to plaintiffs and rebuffing plaintiffs' accusations that the refusal was discriminatory. The trial court dismissed plaintiffs' claims against the attorneys under our anti-SLAPP statute (Code Civ. Proc., § 425.16).[1] This was correct, so we affirm.

**FACTS AND PROCEDURAL BACKGROUND**

I. **Facts**

A. *Plaintiffs sue their landlord and property manager*

In March 2020, plaintiffs leased a unit in an apartment building located in the Hollywood Heights neighborhood of Los Angeles (the building).

In January 2022, plaintiffs sued their then-landlord Wellington Yang (Yang), three of Yang's limited liability companies, and the building's then-onsite property manager. The complaint alleged nine causes of action based on allegations that building management had improperly left fire doors open; had not allowed plaintiffs to replace the washing machine in their unit; had closed the building's pool, gym, and lounge after plaintiffs signed their lease; had withdrawn rent payments from plaintiffs' account on inconsistent dates; had stopped vacuuming the hallways and providing tenants with air filters; had ignored plaintiffs' repair requests; had installed surveillance cameras in common areas; and had threatened to tow plaintiffs' car.

---

[1] "SLAPP" is short for Strategic Lawsuit Against Public Participation. All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

Plaintiffs later alleged that when they complained, the property manager moved into the unit above theirs and began making excessive noise that could be heard through the walls.

**B.    *The building's ownership changes hands***

In November 2022, while the lawsuit was pending, Yang sold the building to Kambiz Hakim, Steven Hakim, and Alexander Hakim (collectively, the Hakims), who hired Quantumprime Realty LLC (Quantumprime) and Nicholas Eliopoulos as property managers.  Yang disclosed plaintiffs' ongoing lawsuit to the Hakims and warned it was "likely that [Washington] will sue [them] for whatever causes he concocts."

**C.    *Washington requests to view another unit, and the new management refuses; when he threatens a lawsuit, management refers him to their attorney***

On November 27, 2023, Washington emailed Eliopoulos and Suzanna Owens (an agent of Quantumprime), expressing a desire to look at another unit in the building that had been listed online as available for rent.  Just 32 minutes later, Washington sent a follow up email demanding a response "or [he] will *add*"—presumably, to his ongoing lawsuit—"th[e new landlord's] failure to agree to show me an available apartment for rent as harassment and discrimination."  Just four minutes after that, Washington sent a third email stating, "You are not allowed to discriminate on the basis of race or any other protected status." Less than one hour after that, Washington sent a fourth email complaining that no one had responded to his nearly two-hour barrage of emails, and indicated he would "call[] . . . in 30 minutes."

Owens responded approximately 20 minutes after the fourth email, informing Washington that Eliopoulos was in a

meeting, but indicating that the building typically did not allow "unit transfers within a property." Washington replied, "There is no rule that a current tenant cannot respond to [a] public ad for let of a unit."

The next morning, Owens emailed Washington, informing him that she relayed his interest to Quantumprime's legal team, and instructed Washington to "reach out to them directly." Washington ignored her instructions, and instead emailed Owens to tell her that he "might have to file a complaint against you for housing discrimination."

**D.** *The attorney tells Washington that his clients will not rent him another unit because he is a "problem tenant"*

Less than an hour after Washington's email threatening litigation, attorney Charlie Stein emailed Washington to tell him that he represents the Hakims and the property managers, and that Washington should direct further communications to his office. Stein went on to tell Washington that his clients are "not required to show you that unit nor rent it to you as long as their decision to refuse to do so is not for a discriminatory reason," and provided two nondiscriminatory reasons for his clients' decision: (1) the building's general policy to relocate tenants only when necessary due to habitability concerns or reasonable accommodation requests; and (2) Washington's "litigious nature"—evidenced by his "decision to subpoena records" and his other "false allegations"—which rendered him a "problem tenant" who would not have received a recommendation from a prior landlord and therefore "would have been initially rejected."

Washington responded to each of Stein's points line-by-line. In response to Stein's instruction to direct further

4

communications to his office, Washington said: "I only 'have to' speak to you if we are in or anticipating litigation. Are we?" In response to Stein's explanation that Washington was a "litigious" and "problem tenant," Washington said: "Is this (ironically) an invitation to litigate? . . . I would be under obligation to bring an action against you if you were to publish such a falsehood without factual support." And in response to Stein's conclusion that Washington's "request to move into another unit in the property is hereby denied," Washington said: "I never made a request. I made a complaint for housing discrimination to LAHD."

Less than an hour later, Washington sent Owens another email, saying: "Are you going to show me the property? Yes or no? If no, why?"

Stein then told Washington that while he was free to file "whatever complaint [he wants] to LAHD," LAHD would "investigate and determine that no such claim is supported by fact." He reiterated: "My client will not grant you a tour of another unit nor will they be accepting your application to move into any other unit in your current property or any other property that they manage."

In response, Washington—who is a lawyer—replied, "I think we must discuss the possibility of a lawsuit against you for defamation and a lawsuit against your clients for housing discrimination." He invited Stein "to meet and confer with my attorney (me as attorney and not a tenant)" and signed the email "Earl, a tenant."

Stein sent one final email, telling Washington: "Should you decide to bring action against me or my client, we will countersue and bring appropriate action against you." He wished

Washington "the best of luck on [his] housing search for a unit elsewhere."

## II. Procedural Background

### A. *Plaintiffs add the new owners, the new property management company, and their attorneys to their ongoing lawsuit*

On September 9, 2024, plaintiffs amended their complaint in the lawsuit for the fourth time, now alleging a total of 14 claims against the prior defendants plus the Hakims, two of their LLCs, Quantumprime, Eliopoulos, Stein and Stein's law firm.[2]

Against Stein and Stein's law firm, plaintiffs alleged claims for (1) harassment by a landlord under Civil Code section 1940.2; (2) violation of Tenant Anti-Harassment Ordinance No. 187109; (3) intentional infliction of emotional distress; (4) negligence; (5) violation of the Unruh Civil Rights Act (Civ. Code, §§ 51, 51.5, & 52); (6) violation of the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12920 et seq.); and (7) violation of the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.).

Plaintiffs' sole factual allegations against Stein and the firm pertain to the emails Stein sent Washington on behalf of Stein's clients in November 2023.

### B. *The trial court grants the attorney-defendants' anti-SLAPP motion*

Stein and the firm filed a special motion to strike pursuant to the anti-SLAPP statute. Specifically, they argued that

---

[2] The two LLCs were 3 Shadows, LLC and Hakim Holdings, LLC. Stein's firm was Davidovich Stein Law Group, LLP at the time, but has subsequently changed its name to Davidovich Stone Law Group, LLP.

6

plaintiffs' claims against them relied entirely on protected activity (namely, attorney communications on behalf of a client), and that plaintiffs did not have a probability of prevailing because the litigation privilege (Civ. Code, § 47) barred those claims.

Plaintiffs opposed the motion. Specifically, they argued that the gravamen of their claims related to Stein and his firm's unprotected activity of "aiding and inciting others to discriminate," and that plaintiffs were likely to prevail both because the litigation privilege does not apply to communications not relating to any pending or imminent litigation and because the more specific provisions of the Unruh Civil Rights Act, FEHA, and the Unfair Competition Law supersede the privilege.

After a full round of briefing and a hearing, the trial court granted Stein and his firm's anti-SLAPP motion on December 9, 2024 and awarded $12,800 in attorney fees pursuant to section 425.16, subdivision (c).

### C.    *Plaintiffs appeal*

Plaintiffs timely appealed.

## DISCUSSION

The anti-SLAPP statute "provides a procedure for weeding out, at an early stage, meritless claims arising from protected activity." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384, italics omitted.) Specifically, the anti-SLAPP statute protects—and thus "subject[s] to a special motion to strike"—any "cause of action . . . arising from any act of [a] person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1).) When a party moves to strike a cause of action under the anti-SLAPP statute, a trial

court has two tasks. (*Barry v. State Bar of California* (2017) 2 Cal.5th 318, 321.) First, the court must evaluate whether the moving party has "made a threshold showing that the challenged cause of action arises from protected activity." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056.) Second, and only if the moving party has made this threshold showing, the court must examine whether the nonmoving party has "established . . . a probability that [it] will prevail" on the challenged causes of action. (§ 425.16, subd. (b)(1); *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 669.) We review de novo the trial court's resolution of each question. (*Abir Cohen Treyzon Salo, LLP v. Lahiji* (2019) 40 Cal.App.5th 882, 887.)

## I.    Plaintiffs' Claims Arise From Protected Activity

A cause of action "aris[es] from" protected activity when the "cause of action *itself*" is "*based on*" "protected activity." (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78, first italics added; see *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1114 ["arise[s] from" means "based upon"].) Whether a cause of action is "based upon" protected activity turns on whether its """principal thrust or gravamen"""" is protected activity—that is, whether the "'core injury-producing conduct'" warranting relief under that cause of action is protected activity (*Colyear v. Rolling Hills Community Assn. of Ranco Palos Verdes* (2017) 9 Cal.App.5th 119, 134, italics omitted); what matters is the "actual activit[y]" giving rise to the claim, not the "label[]" of the cause of action. (*Contreras v. Dowling* (2016) 5 Cal.App.5th 394, 410 (*Contreras*).) "[W]hether [activity] is protected under the anti-SLAPP statute" turns "not [on] First Amendment law, but [rather on] the statutory definitions in section 425.16,

8

subdivision (e)." (*City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 422.) Code of Civil Procedure section 425.16, subdivision (e) defines four categories of protected activity. Two are pertinent here—namely, (1) "any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law," and (2) "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law." (§ 425.16, subds. (e)(1) & (2).) Communications by attorneys representing clients in pending or anticipated litigation, including litigation before administrative tribunals—fall within these categories of protected activity. (*Nirschl v. Schiller* (2023) 91 Cal.App.5th 386, 402; *Briggs,* at p. 1115.)

Plaintiffs' claims against Stein and the firm are all based on protected activity. The core-injuring conduct underlying all of those claims are the emails that Stein sent Washington after Washington threatened to sue Stein's clients. Those emails are protected activity within the meaning of the anti-SLAPP statute because all of those emails were sent under the looming shadow of Washington's repeated threats of litigation. Before Stein sent his first email to Washington, (1) Washington had sued the prior landlord and its property manager, (2) Washington threatened Owens that he would "add" the failure of Stein's clients to show him an apartment "as harassment and discrimination," (3) Washington informed Owens that she was "not allowed to discriminate on the basis of race or other protected status" and that there was "no rule that a current tenant cannot respond to [a] public ad for let of a unit," and (4) Washington threatened to "file a complaint against [Quantumprime] for housing

9

discrimination." And after Stein sent his first email, Washington continued to threaten litigation by (1) sarcastically asking whether Stein's responsive email was "an invitation to litigate" and (2) reporting that he "made a complaint for housing discrimination to LAHD."

Plaintiffs resist this conclusion with what boil down to four arguments.

First, plaintiffs argue the conduct of Stein and his firm loses its status as protected activity under the anti-SLAPP statute because plaintiffs have alleged that Stein and his firm are in cahoots with their clients to "prevent [plaintiffs] from participating in housing opportunities." We reject this argument because plaintiffs offer nothing but allegations of conspiracy and aiding and abetting, which is not enough to deprive the pre-litigating conduct of Stein and his firm of its status as protected activity. (*Contreras*, *supra*, 5 Cal.App.5th at p. 413 ["Conclusory allegations of conspiracy or aiding and abetting do not deprive [a moving party's] actions of their protected status"].)

Second, plaintiffs offer two reasons why Stein's emails were not made in anticipation of litigation (and hence are not "protected activity"). To begin, plaintiffs assert that Stein's emails are not related to anticipated litigation because *Stein and his clients* were not planning to sue. We reject this argument because what matters is whether an attorney's communication occurred under the shadow of anticipated litigation—regardless of *who* is casting that shadow by anticipating suit. (See *California Physicians' Service v. Superior Court* (1992) 9 Cal.App.4th 1321, 1330 [defensive actions taken in response to litigation are protected by the litigation privilege; thus, a party's act in filing an answer is protected by the litigation privilege].)

Plaintiffs next assert that even *they* were not anticipating litigation because Washington's repeated threats to "add" Stein's clients to the ongoing litigation, reminding them what the law requires, and stating that he would "file a complaint against [Quantumprime] for housing discrimination" were not "serious." Although a prelitigation communication constitutes protected activity only if it relates to litigation that is "contemplated in good faith and under serious consideration" (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1251 (*Action Apartment*)), we reject Washington's efforts to downplay the plain and inexorable import of his own words: His threats of litigation were serious because Washington is a lawyer who had, while representing himself, already sued his prior landlord and, indeed, went on to sue the very people—Stein's clients and Stein himself—that he now says he did not seriously intend to sue.

Third, plaintiffs argue that the conduct of Stein and his firm are "unlawful acts," and hence cannot be protected activity under the anti-SLAPP statute. Conduct does not fall outside the definition of protected activity merely because it is alleged to be *unlawful*; to be exempt from the anti-SLAPP statute, the conduct must be *criminal* and that criminality must be either conceded by the defendants or conclusively established as a matter of law. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 320.) Plaintiffs have done no more than allege that Stein and his clients have engaged unlawful acts in violation of statutory and tort law. (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 910-911 ["conduct that would otherwise come within the scope of the anti-SLAPP statute does not lose its coverage . . . simply because it is *alleged* to have been unlawful"].)

Fourth and finally, plaintiffs argue that the trial court's

conclusion that Stein's responsive emails were protected activity rested on the erroneous premise that Washington had already sued *Stein's clients*. We need not consider this argument because our task when engaging in de novo review is to "'review[] the trial court's ruling, not its rationale,'" so any error in the trial court's reasoning is irrelevant. (*Stockton Mortgage, Inc. v. Tope* (2014) 233 Cal.App.4th 437, 446.)

## II. Plaintiffs' Claims Lack Minimal Merit

Once a moving party establishes that a plaintiff's cause(s) of action are based upon activity protected by the anti-SLAPP statute, the nonmoving party must then "establish[] . . . a probability that [it] will prevail" on those cause(s) of action; it does so by showing that those cause(s) of action have "minimal merit"—that is, by showing that the complaint is legally sufficient and by adducing evidence that, if credited, makes a "prima facie factual showing sufficient to sustain a favorable judgment." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 94; *Baral v. Schnitt* (2016) 1 Cal.5th 376, 384-385; *Finton Construction Inc. v. Bidna & Keys, APLC* (2015) 238 Cal.App.4th 200, 211; § 425.16, subd. (b)(1).) This is an "evidentiary motion"; allegations alone do not suffice. (*Contreras, supra*, 5 Cal.App.5th at p. 416.)

Plaintiffs level what reduce down to six causes of action against Stein and the firm: (1) intentional infliction of emotional distress, (2) negligence, (3) tenant harassment (under both the Civil Code and the Los Angeles Municipal Code), (4) housing discrimination (under both the Unruh Civil Rights Act and FEHA), (5) tenant retaliation (under FEHA), and (6) violation of the Unfair Competition Law (based on the alleged violations of the Unruh Civil Rights Act and FEHA). Plaintiffs cannot carry their burden of showing a probability of prevailing on any of

12

these claims.  The sole evidence plaintiffs submit in support of their claims against Stein and the firm are the emails Stein sent to Washington.

California's litigation privilege (Civ. Code, § 47, subd. (b)) bars any claim based on any communication "(1) made in judicial or quasi-judicial proceedings[, which includes administrative proceedings]; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that [has] some connection or logical relation to the action."  (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 216; *Ribas v. Clark* (1985) 38 Cal.3d 355, 364-365 [though originating with tort actions, the litigation privilege is "no less relevant" to statutory claims]; *Wise v. Thrifty Payless, Inc.* (2000) 83 Cal.App.4th 1296, 1303 ["The litigation privilege . . . encompasses actions by administrative bodies and quasi-judicial proceedings"].)  The litigation privilege extends to communications made before judicial proceedings are initiated, including "letters to opposing counsel," as long as those communications bear "some relation" to litigation "contemplated in good faith and under serious consideration."  (*Contreras*, *supra*, 5 Cal.App.5th at p. 415; *Action Apartment*, *supra*, 41 Cal.4th at p. 1251; *Rubin v. Green* (1993) 4 Cal.4th 1187, 1193-1194.)  ""Any doubt about whether the privilege applies is resolved in favor of applying it."" (*Contreras*, at p. 415.)  Because Stein's emails constitute communications on behalf of his clients made in direct response to Washington's threats to sue Stein's clients for housing discrimination, and because the content of the emails—Stein's rebuttal to Washington's accusations—are directly related to that threatened litigation, the litigation privilege applies and bars plaintiffs' claims.  Indeed, the litigation privilege "cover[s] precisely the type of communications at issue

13

here." (*Ibid*.; see *Rubin*, at pp. 1194-1195 [collecting cases]; see generally *Osborne v. Pleasanton Automotive Co., LP* (2024) 106 Cal.App.5th 361, 382-394 [applicability of the litigation privilege's bar means a claim lacks minimal merit].)

Plaintiffs resist this conclusion with two categories of arguments.

First, plaintiffs again assert that Stein's communications were not made in the shadow of anticipated litigation. We reject that argument for the reasons stated above.

Second, plaintiffs argue that the litigation privilege does not bar their statutory claims (namely, their claims under Civil Code section 1940.2, the Los Angeles Municipal Code, the Unruh Civil Rights Act, FEHA, or the Unfair Competition Law) because those statutes supersede Civil Code section 47.

This argument only affects a subset of plaintiffs' claims. It does not apply to plaintiffs' claims for negligence or intentional infliction of emotional distress, both of which are tort claims and thus remain barred by the litigation privilege. It does not apply to plaintiffs' claim for violation of the Los Angeles Municipal Code, which is a local law preempted by the litigation privilege enacted by our state Legislature. (*Action Apartment, supra*, 41 Cal.4th at p. 1242.) And it does not save plaintiffs' claim for violation of Civil Code section 1940.2, which regulates the conduct of "landlords" (Civ. Code, § 1940.2, subd. (a)) and does not impose liability on a landlord's *agent*, which is at best what the emails establish Stein and his firm to be.

As to plaintiffs' remaining claims (under the Unruh Civil Rights Act, FEHA, and the Unfair Competition Law), plaintiffs' argument fails on its merits. To be sure, the litigation privilege will not bar liability imposed by a different state statute if

applying the privilege would "'"'effectively immunize conduct that the [other statute] prohibits'" . . . thereby encouraging, rather than suppressing "'the mischief at which it was directed.'"'" (*Winslett v. 1811 27th Ave., LLC* (2018) 26 Cal.App.5th 239, 254-255.)  On this basis, courts have held the litigation privilege does not bar statutory claims for retaliatory eviction (*ibid*.), litigation abuse by debt collectors (*Komarova v. National Credit Acceptance, Inc.* (2009) 175 Cal.App.4th 324, 340), or crimes premised on certain attorney conduct (*Action Apartment*, *supra*, 41 Cal.4th at p. 1246).  However, in each instance, the courts determined that the litigation privilege yielded to the other statute because that statute "regulate[d] conduct occurring in legal proceedings" and "would be significantly or wholly inoperable if [their] enforcement were barred when in conflict with the [litigation] privilege."  (*Ibid.*; *People v. Potter Handy, LLP* (2023) 97 Cal.App.5th 938, 945, 949; *Bassi v. Bassi* (2024) 101 Cal.App.5th 1080, 1102-1103.)  Applying the litigation privilege to conduct regulated by the Unruh Civil Rights Act, FEHA, or the Unfair Competition Law carries no such risk.  The statutes prohibiting housing discrimination and retaliation do not premise liability on litigation-related activity, and there is no indication that the Legislature intended them to fall outside the litigation privilege's ambit or that requiring a plaintiff to support their claims with non-litigation-related activity would gut those statutes' purposes.  (See *Cabral v. Martins* (2009) 177 Cal.App.4th 471, 488-489 [rejecting argument that a statutory claim against an attorney for revising client's will to avoid child support obligations supersedes the litigation privilege because the child support evasion statute is not specifically aimed at attorney conduct].)  Plaintiffs can still prosecute their claims

15

against the landlords based on the landlords' refusal to lease a new unit to them; they just cannot seek redress against the landlord's *attorneys* for the mere act of communicating the landlord's position in response to threatened litigation.

## DISPOSITION

The order is affirmed. Stein and his firm are entitled to their costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, P.J.

HOFFSTADT

We concur:


_____, J.

MOOR


_____, J.

KIM (D.)


16